Charles STEWART and Carolyn C. Stewart, Plaintiffs,

v.

WAPPINGERS CENTRAL SCHOOL DISTRICT, Paul Adams, Supervisor of Transportation, Bruce Reynolds, Supervisor of Finance, all of the Wappinger's Central School District, Individually, and in their official capacities, Defendants.

No. 76 Civ. 3617 (KTD).

United States District Court, S. D. New York.

May 16, 1980.

Crain & Rones, Newburgh, N. Y., for plaintiffs; William E. Crain, Newburgh, N. Y., of counsel.

Rosen, Crane & Wolfson, Poughkeepsie, N. Y., for defendants; William G. Crane, Poughkeepsie, N. Y., of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

Plaintiffs, Charles Stewart and his wife Carolyn, commenced this action in 1976 against Paul Adams and Bruce Reynolds, both individually and in their official capacities as the Supervisors of Transportation and Finance, respectively, for the Wappingers Central School District. In 1977, plaintiffs filed an amended complaint in which they added the Wappingers School District, a municipal corporation, as a co-defendant.

The complaint, as amended, charges that Charles Stewart, a former employee of the Wappingers School District, was denied employment by the defendants solely on the basis of his race. Plaintiffs conclude that such racial discrimination is constitutionally impermissible and violative of sections 1981 and 1983 of the Civil Rights Act. 42 U.S.C. §§ 1981, 1983. In addition, plaintiffs allege that defendants' refusal to employ Charles Stewart was a violation of a collective bargaining agreement to which Mr. Stewart, as a Union member, was a party.

In May of 1977, the defendants moved, pursuant to Rule 12 of the Federal Rules of Civil Procedure, to dismiss the amended complaint. The crux of the motion was that the defendants, a municipal corporation and two of its employees, were not subject to suit under the Civil Rights Act.

In an opinion dated May 30, 1977, 437 F.Supp. 250, I found that all defendants were proper parties to a civil rights action based upon § 1981 of the Civil Rights Act. However, I did conclude, based upon the Supreme Court's decision in *Monroe v.*

*Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and this Circuit's decision in *Monell v. Dept. of Social Services*, 532 F.2d 259 (2d Cir. 1976), that the Wappingers School District was not a suable entity under § 1983 and accordingly dismissed that claim. No appeal of this decision was taken by the plaintiffs.

The *Monell* decision was subsequently appealed to the Supreme Court which found that municipalities were "persons" within the purview of § 1983 and as such were suable entities. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

Thus, in light of *Monell*, plaintiffs' § 1983 claim against the Wappingers School District was sufficient to withstand defendants' motion to dismiss and must therefore be reinstated. I hereby amend my prior opinion to reflect this result.

A three-day trial was held before me which concluded on December 5, 1979. Thereafter, the parties were afforded an opportunity to submit post-trial memoranda. Based upon the evidence received and the testimony elicited at the trial, together with the post-trial submissions of the parties, the following shall constitute my findings of fact and conclusions of law.

I turn initially to review those facts which are not in dispute. Plaintiffs, Charles and Carolyn Stewart, are husband and wife and presently reside in Orange County, New York. Mr. Stewart first applied for a position with the Wappingers School District in 1965. He was hired by John Delano as a full-time driver-cleaner. During the school year, Stewart's duties included the transportation of school children in the district. In the summer months, when school was not in session, Stewart was assigned custodial duties at one of the district's schools.

In 1967, Stewart voluntarily left the Wappingers School District to pursue other employment opportunities. Thereafter, in February 1970, apparently dissatisfied with his employment, he reapplied for a position in the Wappingers District and was again hired as a driver-cleaner by the transportation department. This time, however, Stewart was hired by the defendant Paul Adams.

After his re-employment by the Wappingers School District, Stewart became a member of Teamster's Local 445. By virtue of his membership in Local 445, Stewart was covered by the collective bargaining agreement then in effect between the Union and the school district. This agreement included the following provisions:

Seniority shall prevail, except as limited by Article X hereof, in that the employer recognizes the general principle that senior employees shall have preferences of employment and promotional opportunity for non-competitive jobs and to chose their shifts and to work at the job for which the pay is highest, provided such employees are qualified for such work.

The agreement further provided in Article X:

An employee in one job classification or division of the system may be used in another job classification or division only if no work opportunities are lost by men normally performing work in that job classification or division to which he is transferred. Transfers within the same job category will be permitted only at the option of the District.

. . . . .

An employee assigned work out of his regular job classification shall not be responsible for damage caused as a result of his lack of knowledge in performing the assigned duties, provided such damage does not result from a willful destructive act.

Plaintiffs' Exhibits 1 and 2.

In January, 1971, Stewart talked with his immediate supervisor, Paul Adams, requesting that he, Stewart, be granted a holiday on January 15th to observe Martin Luther King's birthday. Apparently, the teaching personnel were given that day off in honor of Dr. King. However, Mr. Adams initially denied Stewart's request since the district had previously decided not to grant non-teaching personnel that day off.

Undaunted by this initial refusal, Stewart approached Mr. Joseph Kegan, now deceased, who was the Superintendent for the Wappingers District. Mr. Kegan granted Stewart's request and, in addition, instructed him to circulate a petition in order to ascertain whether any other non-teaching personnel wished to observe Dr. King's birthday.

The petition, dated January 8, 1971, was circulated and read as follows:

To Whom it May Concern:

We the undersigned request approved personal day, January 15, 1971, in memory of Dr. Martin Luther King, Jr.

See Plaintiffs' Exhibit 3.

Under this statement were the names of some 120 non-teaching personnel. At the end of this four page petition the following inscription appeared:

"Aproved [sic] personal or emergency day.

Article XV

/s/ E. Joseph Kegan"

After the petition was circulated and four pages of signatures obtained, Stewart, pursuant to the instructions of Joseph Kegan, returned it to Paul Adams. However, despite Mr. Kegan's instruction that all those who signed the petition were entitled to take January 15th as either a personal or emergency day, only those who had not exhausted their quota of emergency days for the year were paid for the 15th. Thus, Adams, apparently still displeased with Kegan's instructions, did not authorize payment for at least those individuals under his authority in the transportation department who took January 15th as a personal day.

Mr. Stewart took January 15th as a holiday and was compensated.

At this juncture the facts are largely in dispute.

*Plaintiffs' Contentions*:

Charles Stewart testified that when the dispute arose with respect to those non-teaching personnel entitled to compensation for January 15th, Adams referred all those questioning the district's decision to Stewart. Adams further indicated that those signing the petition had been misled by Stewart.

In September, 1971, Stewart sustained a back injury while employed by the district. He was directed by his personal physician to remain out of work for a period of four months. Thereafter, in January, 1972, Stewart's doctor advised him that he could return to work on a "light duty" basis. Plaintiffs' Exhibit 4. Stewart immediately attempted to contact Adams to request a light duty position. After numerous unsuccessful attempts, Stewart finally spoke with Adams who apparently assured him that when a light duty position became available, Stewart would be contacted.

It was not until September 12, 1973, that plaintiff was offered and accepted a position as a parts clerk for the Wappingers School District. However, Stewart charges that between January, 1972 and September, 1973, no less than nine individuals requested and were granted reassignment from their normal duties as driver-cleaners to alternative light duty positions which plaintiff was physically capable of performing. All of these individuals were, concededly white. Plaintiffs' Exhibit 5.

With respect to Stewart's qualifications for the position as parts clerk, Adams was against offering the position to Stewart because Adams believed Stewart had no aptitude for the job. However, at the insistence of his superior, Assistant Superintendent Richard Earl Jacobson, Adams hired Stewart for the position. Transcript at 135 [hereinafter referred to as "Tr."].

Stewart also testified that after commencing work as parts clerk he became aware that the defendants Adams and Reynolds, as well as the parts supervisor, Mr. Frank Catucci, "had agreed" that they wanted to get Stewart out of the parts department. Thus, they intentionally made Stewart feel unwelcome during his stint as parts clerk. And finally, in April of 1974, as a result of the concerted efforts of Messrs. Adams and Catucci, Charles Stewart was "forced" to resign and seek employment outside the Wappinger's District. It

was not until November, 1974, that Stewart was able to secure another position.[1]

Stewart attempted to bolster his charges of racial discrimination by offering the testimony of Barbara Jean Rogers. Ms. Rogers was a clerk-typist in the Transportation Department of the Wappingers School District. Her immediate supervisor was the defendant Paul Adams.

In the main, Ms. Rogers testified that Paul Adams was an individual quick to use a racial slur. She testified that on many occasions she heard him make derogatory comments about blacks in general and about certain black individuals who were under his supervision.

Insofar as Mr. Stewart was concerned, these derogatory comments first began after the Martin Luther King incident. It was clear that Adams felt that January 15th was a work day for all non-teaching personnel in the transportation department. He was clearly opposed to the idea of a holiday. Indeed, he was so opposed to his employees taking the 15th as a holiday that he threatened to fire Ms. Rogers as well as another clerk if they joined in the petition. Tr. at 93–94.

Finally, Ms. Rogers testified that Adams and Catucci talked about Stewart's performance as parts clerk. Apparently Mr. Catucci did not want Stewart hired as parts clerk but was told by Adams that Mr. Jacobson, his superior, had directed that Stewart be hired. Thereafter, when Stewart assumed the position as parts clerk, Catucci complained that "[Stewart] made too many problems, he watched everything so closely and he was wearing on his nerves, that he was a pain in the neck." Tr. at 106. Adams responded, "try and bear with him because he did not have any choice in the matter and just not to make him feel too welcome, not to make him feel too comfortable, and that he would probably be gone before long." Tr. at 106.

Stewart's wife and co-plaintiff, Carolyn, did not testify in support of her own claims or those of her husband.

*Defendants' Contentions:*

In many respects the testimony offered by defendants does not contradict that offered by the plaintiffs. However, in certain crucial areas defendants have presented quite a different scenario.

Defendants do not dispute that a controversy arose with respect to those who were entitled to be compensated for observing Dr. King's birthday. Nor did they contradict Stewart's on the job injury or the period for which he was totally disabled. In fact, Adams' testimony corroborated Stewart's story in that he recalled Stewart requesting a light duty position in January, 1971.

The facts defendants dispute are the circumstances surrounding Stewart's request, the granting of light duty positions to others while Stewart remained out of work, his placement as parts clerk, and his ultimate resignation from that position.

Initially, defendants' contend that all those granted light duty assignments in the transportation department, save one individual, had greater seniority than Stewart and, under the terms of the bargaining agreement, were entitled to preference in securing these positions. The lone exception was a temporary appointment for a two-week period.

In addition, Adams testified that when Stewart requested light duty, he limited his request for an appointment as a permanent, full time station wagon driver. Tr. at 133. Defendants urge that given this very limited request, Stewart effectively eliminated a host of other potential light duty positions. And, even despite Stewart's limited request for light duty, Adams did inform Stewart that while he had no station wagon positions available, he did have a bus driver position open. Tr. at 133. In fact, this particular bus, unlike those Stewart drove for West Point Tours, Inc. between 1974 through 1976, was equipped with power

---

1. In November 1974, Stewart began working for West Point Tours, Inc. as a bus driver. In March 1976, he left West Point Tours to take a position with Lance Communications managing a broadcasting station in Poughkeepsie, New York—a position he still holds.

steering. This position, however, was apparently refused by Mr. Stewart.

Concerning the position of parts clerk, Adams' testimony was simply that although the position had been open as early as January, 1972, he did not consider Stewart for the position since he did not believe him to be qualified. Adams also repeated that Stewart had only requested a light duty position as a permanent, full time station wagon driver. Tr. at 143. Thus, it was not until Adams received a call from his superior, Mr. Jacobson, whom Stewart had visited in his continuing efforts to secure a light duty position, that Adams was aware 'of Stewart's interest in the position. It was at this point that Stewart was appointed to fill the vacancy.

In addition, defendants' testimony tended to show that there was no concerted effort to force Stewart from the parts clerk position. Rather, the testimony was to the effect that Stewart was simply not qualified for the position. And, if there was any conflict on the job it was not racially motivated but instead the result of Stewart's inability to perform his job and Frank Catucci's abrasive personality.

Finally, defendants' testimony evinced that Stewart voluntarily left the Wappingers School District to pursue a career in show business. Tr. at 163, 177. *See also* Joint Pre-Trial Order at 3.

Plaintiffs' first claim charges defendants with violating § 1981 of the Civil Rights Act. 42 U.S.C. § 1981. That section provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

The essence of plaintiffs' § 1981 claim is that "[Stewart] was subjected to the denial of the same rights to make and enforce employment contracts as is enjoyed by white persons." More particularly, plaintiffs charge that by virtue of Adams' failure to immediately alert Stewart about the parts clerk vacancy and by virtue of employing Mark Ginsberg, a man with less seniority than Stewart, in a light duty position, the defendants have precluded Stewart from enjoying equal seniority benefits with whites under the operative collective bargaining agreement. In addition, plaintiffs allege that Paul Adams, Frank Catucci and Bruce Reynolds conspired to force Stewart to resign from the position of parts clerk because of his race.

■ Turning first to the open position of parts clerk, the evidence simply will not support an award under § 1981. To be sure, it is now settled that "no [job] applicant is *entitled* to a position, even though the applicant may be a . . . member of a minority [group.]" *Logan v. St. Luke's Hospital Center*, 428 F.Supp. 127, 130 (S.D. N.Y.1977) (emphasis in original). Rather, the Civil Rights Act was designed only to ensure that both the competition and selection process for a given position are racially benign. *Id.*

■ A plaintiff's threshold burden in the context of an employment discrimination case brought under § 1981 is to establish a *prima facie* case of racial discrimination. *Hudson v. International Business Machines Corp.*, 620 F.2d 351 at 354 (2d Cir. 1980). This initial burden is met when the plaintiff demonstrates:

> (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).[2]

■ It is only when this initial burden is met that the burden shifts to the defendant to rebut the charge of discrimination by demonstrating sufficient legitimate, non-discriminatory reasons why the plaintiff was not hired.

■ Applying these principles to the case at bar, it is evident that plaintiffs have fallen woefully short of establishing a *prima facie* case of racial discrimination.

There was absolutely no evidence to support the conclusion that the position of parts clerk remained opened for twenty months for racially impermissible reasons. Nor was there sufficient evidence tending to show that Adams refused to consider Stewart for the position based upon racial grounds.

■ On the contrary, Adams' testimony was that he did not feel Stewart was qualified for the position. This testimony was corroborated in that the person who occupied the position of parts clerk prior to Stewart had a great deal of experience as an auto parts man prior to his appointment to that position. Tr. at 134–35. And, while Stewart had some automotive experience as a mechanic's helper in a South Carolina garage while attending high school, even if Adams had actual notice of this experience, which he did not,[3] this experience was sufficiently brief and remote to support Adams' conclusion that Stewart was simply not qualified for the position.

Furthermore, Stewart was offered, and accepted the position as parts clerk before it was offered to any other individual. Thus, as a practical matter, there was no racially impermissible standard employed in filling the position of parts clerk. Nor was Stewart ever refused the position—much less refused the position based upon racially impermissible grounds.

Finally, the fact that there elapsed a significant period of time between the departure of the former parts clerk and the hiring of his replacement is of no moment. We are dealing here with a public school which is, for better or worse, essentially a bureaucracy. And, as a bureaucratic system, it does not always move as fast or as smoothly as it should. Indeed, when questioned on this very point, Mr. Adams testified that the position had never been posted because he, Adams, was simply not interested in filling the position. Tr. at 134, 168. It was not until Mr. Jacobson suggested Stewart for the position that any attempt was made to fill it.

Finally, it must be noted that the position of parts clerk was not a light duty position. On the contrary, the job often required the lifting of heavy bus and automobile parts. However, Stewart himself testified that he did not fully recover from his back injury and considered himself disabled until November, 1974, when he began working for West Point Tours, Inc. as a bus driver. Tr. at 73.

I must conclude, based upon this evidence, that Stewart was never physically

---

**2.** While these elements are not the exclusive method by which a plaintiff may prove *prima facie* discrimination, there can be no doubt that whatever criteria is employed, the plaintiff bears the initial burden of offering evidence "adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977).

**3.** It was evident from the testimony that Stewart had never requested the position of parts clerk prior to seeing Mr. Jacobson. It is equally apparent that Stewart never informed Adams, or anyone else in the transportation department during this period, of his prior, albeit limited, automotive experience. However, Stewart does argue that since this information was contained in his initial job application, Adams and the school district should be charged with this knowledge. I disagree.

I am unwilling to charge either Adams or the school district with knowledge of all information on the hundreds of job applications in their files. If Stewart had alerted Adams of his prior experience and Adams chose to ignore the experience, this would be a different matter. Absent that, however, in these circumstances no knowledge will be attributed to the district or any of its employees.

capable of performing the job of parts clerk. Thus, in any event, Stewart's physical inability more than justifies the initial reluctance to appoint him to that position.

■ Turning to the question of Stewart's request for light duty employment and the employment of Mark Ginsberg in his stead, this too will not support plaintiffs' § 1981 claim. It is true that Mr. Ginsberg was less senior than Stewart and yet was given a light duty position before him. However, the undisputed testimony indicated that the position was only a temporary one lasting two to three weeks from June 1 through June 22, 1973. Indeed, this was the only period in which Ginsberg worked as a station wagon driver or courier. In fact, shortly after this temporary appointment Mr. Ginsberg resigned from the district.

It is evident to me that this very temporary assignment to a light duty position was not a position which Stewart had requested or desired. On the contrary, Stewart himself testified that he only requested a permanent, full time appointment in a light duty position. Tr. at 73–74. He never asked Mr. Adams for a part-time appointment to such a position. Id. See also Tr. at 138 and Defendants' Exhibit A. Accordingly, except for Ginsberg, all those appointed to light duty positions in the transportation department during the period in issue were not only senior to Stewart but were assigned to permanent light duty positions.

The Ginsberg incident was at best an isolated breach of the seniority provisions in the bargaining agreement rather than the manifestation of a racially discriminatory scheme designed to deny blacks employment opportunities in the school district.

There were two other individuals, also less senior than Stewart, who were reassigned during this same period. They were Mr. Chase and Mr. Keller. However, both individuals were hired by a department other than the transportation department. Both individuals accepted positions as permanent, full time custodians. Tr. at 100–01, 102–03.

The uncontroverted evidence was that full time custodians, as opposed to driver-cleaners, were neither hired by nor under the control of the defendant Adams. Tr. at 82–83, 136–37. They were under the authority of a separate department.

More importantly, however, these custodial openings were posted for competitive bidding by all school employees. Under the seniority provisions of the bargaining agreement, quoted above, the most senior individual bidding for the open position will be appointed. Thus, Stewart was in as good a position as both Chase and Keller to bid for these custodial jobs and, given his seniority, would have been the first appointed. His failure to secure one of the open custodial positions can only be attributed to his own failure to bid for them.

■ Finally, I turn to the allegedly discriminatory treatment of Stewart while he was employed as parts clerk. It is urged that Paul Adams, Frank Catucci and Bruce Reynolds, through a program of harassment and non-cooperation, successfully drove Stewart from this position. Plaintiffs charge that the sole reason these individuals wished to oust Stewart from the position of parts clerk was because he was black.

Even if I were to conclude that these individuals had conspired to force Stewart from his job, there is not sufficient evidence to establish that their conduct was racially motivated. On the contrary, the totality of credible evidence leads to any number of conclusions with respect to Stewart's departure from the school district—all of which are racially benign.

The first possibility, and the only one which plaintiffs' own evidence will support, is that Paul Adams and Frank Catucci wanted Stewart out of the parts department because they were engaged in some conduct with respect to the automotive parts in their charge, which they wanted to keep secret.

Stewart testified that when Mr. Jacobson gave him the position of parts clerk, it was with the express direction to keep a close

watch on the inventory. Tr. at 66. However, when Mr. Stewart attempted to do just that, his efforts were frustrated by Mr. Catucci. Tr. at 65. In large part Stewart complained about the lack of cooperation he received from Catucci on the job. Indeed, Mr. Stewart testified that he was often instructed by Catucci to sign invoices for certain parts which Stewart knew were never received. Tr. at 65–66. Apparently Stewart signed these invoices without objection despite the fact that he believed something unethical was afoot. *Id.* However, under these circumstances Catucci made it very difficult for Stewart to keep a close watch on the inventory.

Given Stewart's own testimony the logical conclusion is that Adams and Catucci, if indeed they wanted to get rid of Stewart, were not racially motivated. Rather, they had a non-discriminatory, albeit a potentially felonious, reason for forcing Stewart to resign.

This conclusion is further supported not only by plaintiffs' only other witness, Barbara Rogers, but also by the uncontested facts surrounding Adams' decision with respect to filling the position of parts clerk.

Ms. Rogers testified that Adams and Catucci spoke about Stewart's performance on the job and were most concerned with the fact that he, Stewart, created too many problems because he watched everything so closely. Tr. at 106. Nowhere in her testimony, however, did Ms. Rogers indicate or suggest that the desire to get rid of Stewart was racially motivated.

In addition, Adams' uncontroverted testimony was that the position of parts clerk remained open for twenty months because he, Adams, simply did not wish to fill the position. Tr. at 168. It was not until Mr. Jacobson insisted that the position be filled by Mr. Stewart that a new parts clerk was considered.

Given these circumstances it may be concluded that the reason Adams did not attempt to fill the position was because neither he nor Catucci wanted a parts clerk to interfere in their otherwise unfettered control over the concededly valuable parts inventory.

Another conclusion which was supported by defendants' evidence, was that Stewart voluntarily left the position as parts clerk to pursue a career in music. Mr. Jacobson, since retired from the school district, testified that Stewart never submitted a written letter of resignation stating his reasons for leaving. Instead, Stewart simply informed Jacobson that he was leaving to pursue other employment opportunities in the music field. Tr. at 177. Apparently Messrs. Adams and Catucci were told the same thing by Stewart. Tr. at 163.

Finally, the charge that Stewart was driven from his position as parts clerk because of racial discrimination was rebutted by Jacobson's testimony that Frank Catucci was a vigorous and abrasive supervisor. Tr. at 174. Apparently Mr. Catucci was equally obnoxious to all those working under him regardless of their race. Tr. at 188. He did not single Stewart out for discriminatory treatment.

Under all the circumstances, I am hard pressed to find even a scintilla of discriminatory motive or intent on the part of the school district or any of its employees in filling the position of parts clerk. Nor am I able to find any discriminatory motive or intent in the parceling out of light duty positions in the district between January, 1972 through September, 1973, or in the way Mr. Stewart was treated during his tenure as parts clerk for the Wappingers District.

Even if I were to conclude that plaintiffs had demonstrated a *prima facie* case of discrimination, the defendants have offered more than sufficient nondiscriminatory reasons for the delay in filling the parts position; the initial decision not to consider Stewart for the position; the failure of the district to offer Stewart the temporary light duty position given to a less senior man, and the alleged desire of Messrs. Adams and Catucci to drive Mr. Stewart from the position of parts clerk. *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 802–03, 93 S.Ct. at 1824. Thus, plaintiffs' § 1981 claim must be dismissed.

Plaintiffs' second claim charges a violation of § 1983 of the Civil Rights Act. 42 U.S.C. § 1983. That section provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Plaintiffs' § 1983 claim, parroting their § 1981 claim, charges that Stewart was denied employment solely because of his race. Amended Complaint at ¶ 27. And, as with plaintiffs' § 1981 claim, it too must be dismissed.

I need not reiterate the evidence offered in support of plaintiffs' second claim. Nor is it necessary to again state defendants' evidence in response thereto. Suffice it to say that as far as the § 1983 claim is concerned, plaintiffs have failed to demonstrate that Stewart was either denied an employment opportunity or forced to leave his job in the Wappingers School District as a result of impermissible racial discrimination. Rather, the totality of credible evidence will only support the conclusion that any delay in hiring Stewart as parts clerk was due both to Stewart's employment inexperience as well as Paul Adams' unwillingness, for whatever reason, to fill the position.

Plaintiffs' third claim alleges, without benefit of elaboration, various constitutional claims. In particular, plaintiffs allege that the defendants' conduct violated the First, Fifth, Ninth, Thirteenth, Fourteenth and Fifteenth Amendments of the United States Constitution insofar as these amendments prohibit racial discrimination.

In large part, plaintiffs' allegations amount to nothing more than restating their sections 1981 and 1983 claims and as such they deserve very little comment. It is enough to say that the plaintiffs have failed to present sufficient evidence to sustain these claims of racial discrimination.

There is one constitutional claim which, however inartfully alleged, does warrant independent treatment. It involves an alleged infringement of the first amendment's guarantee of free speech. In essence it charges that Stewart was subjected to discriminatory treatment merely because he chose to exercise his first amendment right of free speech. More particularly, plaintiffs urged at trial that because Stewart chose to speak out in favor of observing Martin Luther King's birthday and circulated a petition among his fellow workers requesting that the day be deemed a holiday for those wishing to observe it, he was singled out for discriminatory treatment by the defendants. And, although never expressly articulated by plaintiffs, plaintiffs appear to argue that in addition to the Martin Luther King incident, Stewart was subjected to abusive treatment as the result of a 1973 complaint he filed against the school district with the New York Human Rights Commission charging job discrimination. The evidence, however, will not support either of these allegations.

It is undisputed that Stewart was permitted to observe Martin Luther King's birthday without incurring any loss. In addition, there is no indication that Stewart's first amendment right to free speech was in any way fettered by the defendants. To the contrary, Stewart was permitted to circulate the petition with the district's blessing. And, at least those with sufficient emergency time were paid for the day.

With respect to the complaint filed with the Human Rights Commission, a similar result obtains. Stewart freely filed the complaint in 1973 just two months prior to his appointment as parts clerk. There is no evidence that Stewart was instructed or even asked to withdraw the complaint as a condition precedent to his appointment as parts clerk.

Nor is there any evidence that the filing of the complaint was held against Stewart after he assumed the position as parts clerk. Indeed, the only evidence Stewart offered

in this regard was a conversation he overheard between the defendant Reynolds and Adams. On direct examination Stewart testified:

> I did on one particular occasion overhear Mr. Reynolds and Mr. Adams making comments with respect to my complaint to the New York State Human Rights Commissioner and Mr. Reynolds said to Adams, 'We fixed that nigger; we proved him to be wrong' and that was very upsetting to me.

While defendant Reynolds' comment, if accurate, is far from racially benign, when stripped of its racially inflammatory language, it merely reflects the Human Rights Commission's finding of no job discrimination. This is a far cry from the type of comment or conduct necessary to demonstrate that Stewart's first amendment rights had been chilled.

Plaintiffs' fourth and final claim runs to the collective bargaining agreement between Local 445 and the Wappingers Central School District. The claim, in essence, charges that since others with less seniority than Stewart were given light duty positions ahead of him, the defendants violated the seniority provisions of the bargaining agreement.

I need not comment as to whether the school district, with or without the union's blessing, violated the strict terms of the bargaining agreement. It is sufficient to note that of those less senior than Stewart, only Mark Ginsberg was given a light duty position in the transportation department. The others were given full time custodial positions. Since Stewart never applied for nor requested a custodial position, he cannot now charge that these appointments somehow violated his rights under the bargaining agreement.

Moreover, the evidence was clear that Stewart only requested a permanent, full time light duty position as a station wagon driver. However, Ginsberg was hired only as a part time driver for a two-week period at the end of a school year. This too was not a position for which Stewart either applied for or requested. As such, he can-

not now charge that Ginsberg's temporary appointment amounted to a breach of the bargaining agreement.

In sum, none of the three appointments in issue were to positions which Stewart had requested or even desired. Thus, he has failed to demonstrate that he has in any way been injured by the appointment of these individuals and is without standing to challenge the district's conduct with respect thereto.

Accordingly, plaintiffs' complaint is dismissed.

Judgment will enter accordingly but no costs will be allowed.